

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 30, 2022

**BY ECF**
The Honorable Sidney H. Stein
United States District Judge
500 Pearl Street
New York, NY 10007

     Re:    ***United States v. Xing Lin*, 11 Cr. 114 (SHS)**

Dear Judge Stein:

    The Government respectfully submits this letter in advance of the June 8 resentencing of defendant Xing Lin on his remaining counts of conviction following vacatur of his conviction on Count Three, using and carrying a firearm in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j), in light of *United States v. Davis*, 139 S. Ct. 2319 (2019).

    For the reasons explained below, the Court's original sentence of life imprisonment remains necessary to serve the purposes of sentencing. The defendant's serious criminal conduct has not changed from the time of the Court's original sentencing and continues to warrant the sentence originally imposed by the Court. That sentence—which was a Guidelines sentence both at the time of the original sentencing and now—adequately reflects the seriousness and danger inherent in defendant's leadership of a criminal enterprise that engaged in violent acts of extortion, intimidation, and murder.

### I. Factual and Procedural Background

#### A.  Offense Conduct

    From the mid-1990s until 2009, the defendant led a criminal organization that operated in the Chinatown section of Manhattan, as well as in Atlanta and Toronto. (*See* Presentence Investigation Report ("PSR") ¶ 16). Among other criminal activities, the defendant and his followers operated several gambling parlors, extorted the owners of a bus company, and killed a man who interfered with that extortion, as well as an innocent bystander. (PSR ¶¶ 20–38). This conduct is detailed in the PSR and the trial record, and is summarized below.

### a. Lin was the Leader of a Criminal Enterprise That Used Violence to Accomplish its Aims

Testimony at trial established that Lin was a "Dai Lo," or leader, of a group of "kids" or "followers" who acted at his instruction, worked in his gambling parlors, and engaged in violence on his behalf. (PSR ¶ 16; *see* Tr. 606 (testimony that Lin had approximately ten to twenty followers)). From 1990 until the early 2000s, while based principally in New York City, Lin operated three illegal gambling parlors in and around Manhattan's Chinatown. (PSR ¶ 29). At the one, located at 21 Eldridge Street, participants played many hands of cards with about $10,000 per hand. (Tr. 287). At this parlor and others, Lin profited from commissions charged on those bets. (PSR ¶ 29).

These arrangements frequently involved and led to violence. For example, Lin and his followers beat an individual named Yi Qui over a gambling debt, leaving him bleeding from the mouth and bruised. (PSR ¶ 35; Tr. 691–94). After he fled to Canada following the 2004 murders described below, Lin also operated a series of gambling parlors in Toronto in a similar manner; for instance, testimony established that he beat up a rival to force him to abandon a competing gambling parlor, putting him into the hospital. (PSR ¶¶ 29, 38; Tr. 458–59, 511–21).

Across all of his activities, Lin frequently used violence and violent threats "to maintain respect and his position as a Dai Lo, and to eradicate his rivals." (PSR ¶ 16). One of these rivals, Qun Li, testified to four violent encounters with Lin. First, in or about 1996, Lin and three followers approached Li in a restaurant; Lin picked up a soy sauce bottle, threatened to hit Li, and said "I'm going to kill you today." (PSR ¶ 30). Second, at a Flushing nightclub in or about 2000, Lin pointed at another man and directed two of his followers to "beat him up for me." (PSR ¶ 32; Tr. 451–52). Third, shortly after the nightclub incident, Lin and three followers entered a Brooklyn restaurant in which Li was eating. (Tr. 454–455). When Li tried to leave, Lin told him not to leave, and the two exchanged blows. (PSR ¶ 33; Tr. 45-57). Fourth, a few days after the restaurant confrontation, as Li was walking on Eldridge Street in front of the barbershop behind which Lin operated a gambling parlor, Lin came up behind Li, grabbed him, and attempted to drag him inside. (PSR ¶ 34; Tr. 457–58). Li held onto the doorframe to prevent Lin from pulling him in, saw and grabbed a screwdriver that was being used to prop open the door, and stabbed Lin with the screwdriver. (Tr. 458, 499). Lin then released Li, who ran away. (PSR ¶ 34).

Lin and his followers frequently used guns and knives to threaten and attack their rivals and others who interfered with their criminal activities. In addition to the incidents already mentioned, testimony at trial established four additional times that Lin and his followers attacked rivals and victims. First, in or about July 16, 2000, Lin entered a gambling parlor, approached the owner, put a gun to the man's head, and told the owner that he was going to kill him because he was not giving Lin "face," that is, obedience. (PSR ¶ 31; Tr. 291–92). After the owner begged for his life, Lin agreed to spare him on the condition that the owner would give him face in the future. (Tr. 292). Lin then fired a shot into the floor of the gambling parlor; the slug was recovered by NYPD officers who responded to a call of assistance. (PSR ¶ 31; Tr. 292). Second, in approximately 2001, Lin and three or four of his followers entered a gambling parlor, dragged a patron out from the back room, and punched and kicked him a dozen times, all because the person owed a gambling debt. (PSR ¶ 35; Tr. 690–694). Third, in or about September 2002, Lin and his followers went armed to a gambling parlor that was owned by Yi Feng, a rival gangster. (Tr. 611).

Lin fired shots at the parlor and then he and his followers fled.  (PSR ¶ 36; Tr. 612).  Feng's followers chased Lin down the street, caught him, and stabbed him; Lin subsequently relocated to Atlanta.  (PSR ¶ 36; Tr. 318–19, 614).  Fourth, on or about November 14, 2003, after Lin got in an argument with a man named Song Di Xiang at a restaurant, he ordered his followers to stab Xiang, which they did.  (PSR ¶ 37).

### b. Lin Committed Extortion and Murder

From 2002 to 2004, Lin extorted Huo Guang Chen, the owner of an interstate bus company.  (PSR ¶¶ 20-23).  Initially, Chen had turned to Lin for help when Chen learned that a rival company was going to start operating buses on the same route as his company.  (PSR ¶ 20).  Lin took a one third share of the company, met with the competitors, and the competition disappeared.  (*Id.*).  From then on, Chen paid Lin one third of their profits every month. (*Id.*).

In or about July 2003, Lin demanded a larger share of the company from Chen.  (PSR ¶ 21).  When Chen refused, Lin told Chen that Lin and Chen's partner were going expel kick Chen from the company.  (*Id.*)  Chen sought help one of his partner's friends, Chan Qin Zhou, a/k/a "Yi Qun"—a Chinatown businessman, eventual part-owner of the bus company, and later the murder victim.  (*Id.*)  With Zhou's help, Chen remained in the company. (*Id.*; Tr. 322–325).  The next day, Lin and his followers met Chen at Corona Park in Queens and threatened Chen for causing Lin to lose face.  (PSR ¶ 22; Tr. 325-27).  Chen testified that he was scared of Lin and that he agreed to make monthly payments to Lin of $2,000 on top of the monthly profit payments.  (PSR ¶ 22; Tr. 327, 338).

In or about May 2004, Zhou learned that Chen was making $2,000 side-payments to Lin and ordered him to stop.  (PSR ¶ 23).  Chen told Lin that another shareholder had ordered Chen to cease the payments.  Lin told Chen that he knew who the other shareholder was—Zhou—and threatened to harm Zhou.  (*Id.*).  Chen nonetheless stopped paying Lin in July 2004.  (*Id.*).

On July 30, 2004, Lin murdered Zhou and an innocent bystander.  In the early morning hours of July 30, 2004, Zhou was in a private room at a karaoke bar in Queens.  (PSR ¶ 24).  A witness testified that he was outside the room in the hallway when he saw Lin and one of Lin's followers walk quickly down the hall and into Zhou's room.  (Tr. 707–710; *see also* Tr. 107, 834).  Zhou was singing, but once Lin and his follower were in the room, Lin told his follower to "shoot" Zhou, and the follower pulled out a gun and started shooting.  (PSR ¶ 24; Tr. 108–109, 835–37).  Zhou was hit and fell to the ground, and Lin's follower then stood on a table and kept shooting Zhou until his gun was empty. (Tr. 836–37).

Zhou was hit six times; he died from his injuries. (PSR ¶ 25).  The forensic evidence demonstrated that Zhou was in a defensive position with his arms up when he was shot and that the bullets struck him in a manner consistent with the eyewitness testimony, twice on the hands and arms, twice in the chest, once in the side, and once in the back. (Tr. 184–187).  Two waitresses were in the karaoke room at the time and were hit by the gunfire.  (PSR ¶ 25).  A waitress named Mei Ying Li, also known as "Maggie," was hit in the head and died later that night.  (*Id.*). The other waitress survived a gunshot wound to her leg.  (PSR ¶ 25). Following the murder, Lin fled and eventually moved to Toronto.  (PSR ¶ 19).

Roughly ten days after the murders, Lin called Chen. (PSR ¶ 27). Chen asked Lin why he had killed Zhou, and Lin said that he had told his follower to "get rid of" Zhou, which Lin claimed meant for Zhou to be shot "on the arms or legs." (*Id.*). During that call, Lin also told Chen that he still had followers in New York and demanded that Chen continue making monthly payments to Lin's wife, which Chen did until November 2009. (PSR ¶¶ 27-28).

### 2.  Arrest, Trial, Sentence, and Appeal

Lin was arrested in Canada on April 14, 2011, was extradited to the U.S. on August 19, 2011, and appeared in this District on August 22, 2011. (PSR ¶ 39). At the time, Lin had been charged by a grand jury only with killing Zhou and Li through the use of a firearm, in violation of 18 U.S.C. § 924(j). (Dkt. No. 2).

On June 27 and 28, 2012, Judge Cederbaum held change of plea hearings. On June 27, the defendant began to enter a plea of guilty to a superseding information charging the defendant with a violation of 18 U.S.C. § 924(c), aiding and abetting the discharge of a firearm in furtherance of a conspiracy to commit extortion. (Plea Tr. at 5-6; *see* 18 U.S.C. § 924(c)(1)(A)(iii)). During the lengthy colloquy, the defendant stated that he and his bodyguard found Zhou in a karaoke club, at which time the defendant told the bodyguard to teach Zhou a lesson, intending that the bodyguard curse at Zhou or beat him. (*See, e.g.* Plea Tr. at 49-51). The bodyguard had a gun and shot Zhou. The Court said that she would "accept the plea," but "would really like to hear another allocution" the next day, explaining that the defendant "doesn't want to answer [the Court's] questions too completely," and that specifically the defendant may be "reluctant to face up to the fact that he may well have instructed violence." (Plea Tr. at 51, 53). The Court thought that "if he never told [the bodyguard] before to beat anybody, that is a little weird – that saying teach him a lesson means that he should beat him." (Plea Tr. at 53). The Court wanted further allocution on the relationship between the bodyguard and the defendant, and more generally to "tighten up the allocution." (Plea Tr. 54-55). When the defendant returned the next day, his counsel informed the Court that he was "not prepared to go forward with his plea of guilty that we attempted to enter yesterday." (6/28/12 Tr. at 2). The Court repeated its sense that the defendant "wasn't really quite ready to admit what he did." (*Id.*). At a later status conference, the Court expressed further concerns about the sufficiency of the allocution, including the absence of sufficient allocution regarding the element that the firearm was used "in relation to a conspiracy for extortion," since it was not clear that the bodyguard was also part of the extortion conspiracy. (7/12/12 Tr. at 2-3).

After Lin's failed plea allocution, the Grand Jury returned two superseding indictments. The second, returned on September 28, 2012, charged the defendant in five counts. (*See* Dkt. No. 23). Count One charged the defendant with engaging in a racketeering conspiracy, in violation of 18 U.S.C. 1962(d). (PSR ¶ 2). Count Two charged the defendant with racketeering, in violation of 18 U.S.C. § 1962(c). (*Id.* ¶¶ 3–8). Count Three charged the defendant with causing death through use of a firearm in the course of the extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 924(j). (*Id.* ¶ 9). Count Four charged the defendant with Hobbs Act extortion, in violation of 18 U.S.C. § 1951. (*Id.* ¶ 10). Count Five charged the defendant with conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951. (*Id.* ¶ 11).

On April 25, 2013, after an approximately two–week trial, a jury found the defendant guilty on Counts One through Four of the superseding indictment, and acquitted him on Count Five. (*Id.* ¶ 12).

In the original Presentence Report, the Probation Office calculated the Guidelines as life imprisonment, based on a total offense level of 43 and a Criminal History Category of III. (PSR ¶ 125). The defense argued for a sentence of less than life imprisonment. (*See* Dkt. No. 80 ("Sent. Tr.") at 5–7). The Government argued that a sentence of life imprisonment was appropriate. (*See* ECF No. 71 ("Gov't Sent. Mem.") at 1–2). As the Government explained in its sentencing submission," Lin and his followers used violence and violent threats to maintain Lin's position in the community," committing extortion, assault, and murder. (*Id.* at 9).

On October 21, 2014, Judge Cedarbaum sentenced the defendant to life imprisonment on Counts One, Two, and Three, and 20 years' imprisonment on Count Four, to run concurrently with the life sentences. (Judgment, Dkt. No. 78). The Court emphasized the gravity of the defendant's criminal conduct, noting that "this was a serious and heavy case" and ruling that "there is no question, based on the evidence in this case, that [the defendant is] responsible for the death of another human being." (Sent. Tr. at 9:2–7).

The defendant appealed to the Second Circuit, arguing, among other issues, that his conviction on Count Three must be vacated because Hobbs Act extortion, the predicate crime for the 924(j) count, is not a crime of violence as defined in 18 U.S.C. § 924(c), and so could not be a predicate for Count Three. *See United States v. Lin*, 683 F. App'x 41, 43 (2d Cir. 2017). In March 2017, the Circuit rejected that argument on plain error review and affirmed his conviction. *See id.* at 44. In May 2018, the Supreme Court granted the defendant's petition for a writ of certiorari and vacated and remanded for further consideration in light of its decision in *Sessions v. Dimaya,* 138 S. Ct. 1204 (2018). *See Lin v. United States*, 138 S. Ct. 1982 (2018) (Mem.). The following February, the Circuit again upheld Lin's conviction on Count Three. *See United States v. Lin*, 752 F. App'x 106, 107 (2d Cir. 2019). Finally, in October of the same year, the Supreme Court granted Lin's second petition for certiorari and vacated and remanded for further consideration in light of *United States v. Davis*, 139 S. Ct. 2319 (2019). *See Lin v. United States*, 140 S. Ct. 98 (2019) (Mem.). In February 2020, the Circuit, considering the defendant's appeal for the third time, vacated Judge Cedarbaum's original judgement as to Count Three, affirmed as to Counts One, Two, and Four, and remanded the case to this Court for resentencing. *See United States v. Lin*, 792 F. App'x 139 (2d Cir. 2020). The defendant has been detained since April 14, 2011, or for approximately 11 years and one month.

## II. Probation's Guidelines Calculation is Correct

The Probation Office calculates that the total offense level and criminal history category are the same as at the original sentencing (PSR p. 2). Specifically, the Probation Office calculates:

- U.S.S.G. § 2E1.1 is the applicable Guidelines provision. That provision treats each underlying racketeering offense as a separate count of conviction. (PSR ¶ 47).

- By operation of U.S.S.G. § 3D1.2(b), the defendant's three remaining counts of conviction and six underlying racketeering offenses merge into three groups. (PSR ¶ 47).

- Group 1 – the murder of Zhou and conspiracy to murder Zhou – has an offense level of 47 as follows:
    - The base offense level of 43 pursuant to U.S.S.G. § 2A1.1, the first degree murder Guideline. (PSR ¶ 50). Although the racketeering acts charged are violations of state law—specifically, New York Penal Law §§ 125.25, 105.15, and 20.00 (*see* PSR ¶¶ 4(a)-(b)), the offense level for the "most analogous federal offense" applies, U.S.S.G. § 2E1.1 app. n. 2.
    - Four levels are added because the defendant was an organizer or leader of the criminal activity, which involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). (PSR ¶ 53).[1]

- Group 2 – extortion – has an offense level of 47 as follows:
    - Section 2B3.2 applies. And because a "victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States," U.S.S.G. § 2A1.1 applies. *See* U.S.S.G. § 2B3.2(c)(1). (PSR ¶ 56).
    - Four levels are added because the defendant was an organizer or leader of the criminal activity, which involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). (PSR ¶ 59).

- Group 3 – gambling offenses – has an offense level of 23 as follows:
    - The base offense level for gambling offenses is 12, pursuant to U.S.S.G. § 2E3.1(a)(1). (PSR ¶ 62).
    - Because that offense level is less than 19, the offense level is 19, as the minimum offense level for racketeering activity, pursuant to U.S.S.G. § 2E1.1. (PSR ¶ 62).
    - Four levels are added because the defendant was an organizer or leader of the criminal activity, which involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). (PSR ¶ 65).

- Pursuant to U.S.S.G. § 3D1.4, Group One is counted as one unit, and Group Two is counted as one additional unit for a group that is equally serious. Group Three is not counted as a unit because it is 9 or more levels less serious than Group 1. Accordingly, the defendant has two units, which adds two levels. (PSR ¶¶ 68-73).

---

[1] Because Count Three was grouped with two racketeering predicates, this Guidelines analysis is not affected by the vacatur of Count Three.

- Accordingly, the total offense level is 49, which is treated as level 43—the maximum level on the sentencing table. (PSR ¶¶ 76-78).

At offense level 43 and in Criminal History Category III, the Guidelines range is life imprisonment. (PSR ¶ 125). The PSR also noted that many other criminal acts could be treated as related conduct, but need not, because the "even without them the defendant exceeds the highest offense level on the Sentencing Table." (PSR ¶ 48).

The defendant challenges this Guidelines analysis in four respects. Each of these arguments lacks merit.

*First*, the defendant argues that the most analogous offense to the Group One offenses is second-degree murder, governed by U.S.S.G. § 2A1.2, rather than first-degree murder. The first-degree murder Guideline does not apply, the defendant argues, because "here, there was no finding of premeditation." (Def. Sent. Sub. at 3). Similarly, regarding Group Two, the defendant argues that the cross-reference to the first-degree murder Guideline is inappropriate because there was no evidence that the defendant engaged in a premeditated murder. (Def. Sent. Sub. at 5).

This argument misses the mark. The only reason for an absence of express discussion of premeditation is the fact that premeditation was obvious to the Probation Office, to Judge Cedarbaum (who observed the trial), and even the defendant, who did not object to the original Guidelines calculation. As discussed above and in the Presentence Report, the defendant's murder victim was interfering with the defendant's efforts to extract money and control over a bus company. (PSR ¶¶ 20-23). In May 2004—two months before the murder—the defendant "threatened to harm" the victim. (PSR ¶ 23). And the murder itself was no murder of passion: the defendant and his associate walked quickly down a hallway into the karaoke room and closed the door, and the defendant told one of the occupants to sit down and said to a third party in the room to "just sit down, it has nothing to do with [you]." (Trial Tr. 708-11, 108). The defendant then *ordered* his associate to shoot the victim—after which, the associate emptied his gun, shooting the victim six times. (PSR ¶¶ 24-25; Trial Tr. 836). The trial evidence proved an execution of the victim and amply supports application of the first-degree murder guideline.[2]

---

[2] The defendant argues that the Government "expressly argued it was not required to prove premeditation for purposes of any of the Group One murders." (*Id.*). On this point, the defendant cites to portions of the charge conference in which the Government sought to eliminate premeditation from the jury charge, as well as a similar jury note in which the Government explained that Count Three could be proven without a showing of premeditation. (*See* Def. Sent. Sub. at 3, 5 (citing Tr. 904-11, 1111-32)). As the Government explained at the charge conference, the now-vacated Count Three encompassed both first and second degree murder, so the Government did not "have to prove it" to the jury. (Tr. 907; *see* 18 U.S.C. § 924(j) (penalizing any murder as defined in 18 U.S.C. § 1111)). The Government's correct view that, as a legal matter, Count Three did not require the jury to decide beyond a reasonable doubt that the murder was premeditated says nothing about the Government's view of the evidence, much less the

*Second*, the defendant argues that application of the Guidelines provision for first-degree murder, which sets the Guidelines range at a life sentence, is in conflict with statutory terms of imprisonment for the individual racketeering acts, which contain statutory maxima. (Def. Sent. Sub. at 3-4). Because the Guidelines conflict with the statute, he argues, the statute controls. (*Id.* at 3). Of course, the racketeering offenses themselves—as distinct from the individual acts—do not contain such maxima, and a life sentence is not only available, but was previously imposed and should be imposed again. And in any event, there is no conflict between the Guidelines and the statutes. The Guidelines provide that, "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline range." U.S.S.G. § 5G1.1(a); *see id.* § 5G1.1(c) ("In any other case, the sentence may be imposed at any point within the applicable guideline range, provided that the sentence . . . is not greater than the statutorily authorized maximum sentence."). Accordingly, the defendant errs in suggesting that an extortion-relating killing, constituting first degree murder, has a Guidelines range of life that conflicts with the 20-year statutory maximum. (Def. Sent. Sub. at 4). The Guidelines range would be the statutory maximum, by operation of the Guidelines. And in any event, were there a theoretical conflict between the Guidelines and the statutory maximum, the correct solution would be to apply the Guidelines up to the statutory maximum, not to apply some other Guideline atextually to avoid the conflict.

*Third*, the defendant objects to the application of a four-point enhancement under U.S.S.G. § 3B1.1(a) for being the organizer or leader of criminal activity which involved five or more participants or was otherwise extensive, because only one other follower participated in the murder. (Def. Sent. Sub. at 4).[3] The Second Circuit has held, however, that "a defendant's role adjustment" in a racketeering case "is to be made on the basis of the defendant's role in the overall RICO enterprise," rather than "his role in each underlying predicate." *United States v. Ivezaj*, 568 F. 3d 88, 99 (2d Cir. 2009). As the Circuit has explained, "it makes little sense to allow a defendant who acts in a leadership capacity in a wide-ranging criminal enterprise to have his offense level adjusted on the basis of his participation in discrete racketeering acts," and the Guidelines provision separating individual RICO acts is "only for the purpose of establishing the base level offense, not for applying the Chapter Three adjustments." *Id.* And in any event, application of these points is irrelevant: the defendant's offense level was 49, which reduced to 43 only because the maximum offense level is 43. (PSR ¶ 78). Even without this enhancement, the offense level would be 45, which would similarly reduce to 43, yielding no change to the Guidelines range. And at a minimum, the defendant led his associate, directing him to murder Zhou, so the two-level enhancement of U.S.S.G. § 3B1.1(c) applies.

*Fourth*, the defendant argues that he should receive a two-level reduction for acceptance of responsibility, or at least a downward variance, for having accepted responsibility. The

---

preponderance of that evidence. And in any event, as the Government explained at the time, the proof of premeditation "is there." (Tr. 907).

[3] Although the defendant's objection is limited to application of this provision to Group One, the defendant does not apply § 3B1.1(a) when recalculating the Guidelines for Group 2, the extortion counts. (*See* Def. Sent. Sub. at 5).

defendant argues that the Court erred in failing to accept his plea, entitling the defendant to credit for his successful—if rejected—allocution.  (Def. Sent. Sub. at 6-9).

The Second Circuit has already rejected this view of the facts.  On direct appeal, the defendant argued that "the district court improperly rejected his attempt to plead guilty."  *Lin*, 683 F. App'x at 43.  But, as the Circuit explained, Judge Cedarbaum said that she "'will accept the plea,'" while asking for "additional legal authorities and a further allocution."  *Id.*; *see supra* p. 4 (noting the district court's concern about whether the defendant was fully candid at the original allocution).  When the defendant appeared the next day, however, his counsel "immediately" said that he was "'not prepared to go forward with his plea of guilty that we attempted to enter yesterday.'"  *Lin*, 683 F. App'x at 43.  Accordingly, the Circuit explained, the "district court did not improperly 'reject' Lin's guilty plea; Lin only attempted to enter a plea the previous day, the district court said it 'will' accept it after further allocution, but Lin then decided not to enter a plea."  *Id.*  Having "decided not to enter a plea," the defendant deserves no departure or variance for accepting responsibility.   And in any event, as the defendant acknowledges, his attempted allocution was to a violation of § 924(c), and not the broader superseding indictment on which he went to trial.  (Def. Sent. Sub. at 8).

In sum, the Probation Office's calculations are correct, and the Guidelines range is life imprisonment.

### III. The Court's Original Sentence of Life Imprisonment Remains Appropriate

As the Supreme Court explicitly recognized in *Davis*, overturned Section 924(c) convictions do not necessarily result in lighter sentences; rather, "when a defendant's § 924(c) conviction is invalidated, courts of appeals 'routinely' vacate the defendant's entire sentence on all counts 'so that the district court may increase the sentences for any remaining counts' if such an increase is warranted."  *Davis*, 139 S. Ct. 2319 at 2336 (quoting *Dean v. United States*, 137 S. Ct. 1170, 1176 (2017)).  Given the facts of this case, the Government respectfully submits that, notwithstanding the vacatur of the defendant's conviction on Count Three, the life sentence originally imposed by Judge Cederbaum remains appropriate.

In this case, the need to protect the public, the seriousness of the conduct, the need to provide for just punishment, and the need for deterrence all require a life sentence, just as they did at the original sentencing.

For more than a decade, the defendant led a criminal organization that spanned multiple cities and used violence to advance his business and status.  The Presentence Report contains nine instances in which the defendant threatened, stabbed, beat, and shot at others to maintain his position and extort others.  (PSR ¶¶ 30-38).  The defendant made a practice of ordering his followers to beat and stab victims, intimidating them with live gunfire, or threatening to kill them.  Most of all, the defendant ordered his associate to shoot a rival, leaving six bullets in that man's body, killing an innocent waitress, injuring a bystander, and risking the lives of still others present.  And after he murdered a rival and an innocent bystander at a karaoke bar, the defendant fled New York, but he continued to engaging in gambling and extortion.  (PSR ¶¶ 29, 38).  He also specifically resumed extortion of the individual who had stopped making payments at the instruction of the person the defendant had recently killed.  (PSR ¶ 27).  The defendant committed

some of these crimes while on probation from other criminal convictions, speaking to the need to protect the public from the defendant.  (PSR ¶ 86).

The defendant argues that his conduct in prison demonstrates that he has been rehabilitated. (Def. Sent. Sub. at 12-13).  The defendant is correct that he has had only two infractions, although one of them—in 2021—troublingly involved a fight at which the defendant reportedly stated that "I was play fighting or horseplay.  I got life and just can hurt him if I wanted."  (Def. Sent. Sub. Ex. G).  And, while his good conduct is otherwise commendable, it also all occurred while his case was on direct appeal.[4]

The defendant also argues that a 180-month sentence is appropriate because murder in the second degree "is publishable under New York law by a sentence of as little as 15 years imprisonment.  N.Y. Penal Law §§ 125.25, 70.00(3)(a)(1)."  (Def. Sent. Sub. at 18).  But the maximum sentence is life imprisonment.  *See* N.Y. Penal Law § 70.00(2)(a).  The appropriate sentence is fact dependent.  And here, the defendant committed murder, and not only one murder, but two, and as part of an extensive, wide-ranging, violent racketeering enterprise.

Finally, the defendant's crime had profound impacts on his victims, and maintaining the original sentence is necessary to fulfill the need for just punishment.  Aside from the financial losses sustained by the victims of the defendant's extortion and the injuries suffered by those whose assaults he ordered, the defendant was responsible for the deaths of two people: a man who interfered with his extortive scheme and an innocent waitress who was in the wrong place at the wrong time.  As the waitress' boyfriend, then an 18-year NYPD veteran, wrote to the Court prior to the defendant's original sentencing:

> Finally, I just want to say, I really miss 'Maggie' a lot.  We had some good times together and I especially miss her smile. 9 long years have gone by but I still bear the brunt of psychological trauma of her tragic death.  The overall impact of this tragedy has compromised my mental and physical health.  The pain and suffering never goes away.  It will be a part of me till the day I die.  I am asking you Judge to give Xing Lin the maximum sentence allowable by law, so that I can have some sort of closure.

(Statement of Edwin Chu, PSR ¶ 42).  It has now been eighteen years since the defendant walked into a karaoke room with his associate and ordered the associate to shoot.

As the Government argued at the original sentencing, the defendant has been convicted of the most serious of crimes, and society must be protected from him.

---

[4] The defendant is correct that he met with the Government following his conviction in the hopes of receiving a sentencing reduction pursuant to Federal Rule of Criminal Procedure 35, and during those meetings, he was assessed to be credible but his information was not useful.  (*See* Def. Sent. Sub. 13).

**IV. Conclusion**

For the reasons set forth above, the Court's original sentence of life remains sufficient, and not greater than necessary, to serve the purposes of sentencing. Accordingly, the Government respectfully urges the Court to resentence the defendant to life imprisonment on his remaining counts of conviction.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _____
Andrew A. Rohrbach
Assistant United States Attorney
(212) 637-2345

CC: Defense counsel (by ECF)