UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

       v.                              11 Cr 114 (SHS)

XING LIN,

          Defendant.
                                Resentencing
------------------------------x

                                New York, N.Y.
                                June 8, 2022
                                2:40 p.m.

Before:

                  HON. SIDNEY H. STEIN,

                                District Judge

                    APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  JACOB FIDDELMAN
     Assistant United States Attorney

KREINDLER & KREINDLER
     Attorneys for Defendant
BY:  MEGAN W. BENETT


Also Present:
BRENDA CHEN, Foochow Interpreter

(Case called)

THE DEPUTY CLERK:  Counsel, please state your names for the record.

MR. FIDDELMAN:  Jacob Fiddelman for the United States. Good afternoon, your Honor.

THE COURT:  Good afternoon.

MS. BENETT:  Good afternoon, your Honor.  Megan Benett on behalf of Xing Lin who is standing next to me listening with the assistance of an interpreter.

THE COURT:  Good afternoon.

MS. BENETT:  Just for the record and for the Court, in the audience today are my client's wife, two children, sister, and several family friends.

THE COURT:  Welcome to everyone.  Please be seated in the courtroom.

We're here for the resentencing of Mr. Lin.  This case was tried a number of years ago before Judge Cedarbaum, and it was appealed to the -- it was obviously a conviction.  It was appealed to the Second Circuit.

And ultimately, a mandate issued on February 27 of 2020 which vacated Mr. Lin's judgment of conviction of the 18 U.S. Code, Section 924(j) count in its entirety.  That was due to the Supreme Court's determination in *Davis*.

In addition, the Second Circuit affirmed the judgment of conviction on all other counts, except as to the sentence.

And due to the vacating of the 924(j) count, the Second Circuit vacated the sentence and remanded to this Court to allow the district court to "consider anew the appropriate sentence for Lin's crimes in the absence of his now vacated Section 924(j) conviction."  That is from the mandate issued on February 27, 2020.

There has been a considerable delay since then.  The pandemic struck two weeks after the mandate was issued.  And there have been many, many, many requests for adjournments by the defense in order to obtain expert views and documents from family members and friends.  And of course there was the pandemic itself.

But we're here now, and let me tell you what I have. In addition to a number of letters dealing with the adjournments, I have the supplemental presentence report which is document 99.  And it was filed on March 30 of 2020.

And the defense submission is an excellent submission by Ms. Benett.  It's document 118 filed on May 19, 2022.  And Ms. Benett's recommendation is for 180 months.  That is based, in part, on her calculation that the offense level should be 37, the criminal history category all parties agree is III.

And on an offense level 37, criminal history category III, the guideline range, according to Ms. Benett, is 262 to 327 months.  And then she sets forth a variety of 3553(a) factors that she believes should lead to a sentence of 180

months.

The probation department and the government have concluded that the offense level is 43, the criminal history category is III, and the guideline sentence is life.

In addition to document 118, which is Ms. Benett's submission of May 19, 2022, which includes an expert report and letters in support of Mr. Lin, I also have the government's submission of May 30, 2022, which is ECF document 119 in which the government states that Judge Cedarbaum's original sentence of life imprisonment "remains necessary to serve the purposes of sentencing."

Ms. Benett, have you had a full opportunity to read and discuss all of this information with your client?  And have each of you in fact read and discussed it?

MS. BENETT:  We have, your Honor.  And I did get the PSR and the defense sentencing submission translated to my client prior to the hearing today.  We have not had the time to have a formal translation provided to Mr. Lin on paper of the government's sentencing submission, but we did review the contents of it.  And he will have a copy of that translated as soon as possible as well.

THE COURT:  Was it read to him though?

MS. BENETT:  Yes.

THE COURT:  What's his language?  Mandarin?

MS. BENETT:  Foochow.

THE COURT:  Foochow?

MS. BENETT:  Yes.

THE COURT:  Was it read to him in Foochow?

MS. BENETT:  Yes.

THE COURT:  And you discussed it with him?

MS. BENETT:  We discussed it, yes.

THE COURT:  All right fine.  Do either of you have any objections that you wish to lodge at this time?

MS. BENETT:  Not beyond the guidelines calculation objections in the defense sentencing submission.

THE COURT:  Ms. Benett, is there any other additional information I should have, by the way, any additional written information?

MS. BENETT:  Any additional information?

THE COURT:  In writing.

Am I missing anything?

MS. BENETT:  No.  Everything you described is the entirety of the defense submission.  Thank you, your Honor.

THE COURT:  Thank you.

Government, is there any additional written information the government believes I should have?

MR. FIDDELMAN:  No, your Honor.

THE COURT:  Do you have any objections to the findings of fact in the presentence report?  I take it no.

MR. FIDDELMAN:  We do not.

THE COURT:  I adopt the findings of fact in the presentence report.

Ms. Benett, I want to hear your position.  I'll hear whatever you want to tell me.  I do believe that the government's calculation and the probation department's calculation is correct.  And therefore, the offense level is 43, the criminal history category is III, and the guideline sentence is life.  So I am making those findings.

I do want to hear your argument though on the 3553(a) factors.  My sense going into this -- and I've obviously read and thought about this at some length.  I did not preside over the trial.  But after it was assigned to me, I obviously have reviewed all of this information.

I do think a sentence below life is appropriate, given the 3553(a) factors.  So I want to hear your position here.  I do think a variance is appropriate, given his apparent rehabilitation, the conditions of confinement during COVID.  And in fact, he was at the MDC and I believe started at the MCC before it was closed.

Is that correct?

MS. BENETT:  That is correct, your Honor.

THE COURT:  And had a difficult time in both of those institutions.  And the fact that he'll be deported.  In fact, I'm going to recommend that he most certainly be deported at the end of his custodial term.

And the fact that he has succeeded -- I'm not quite sure how, but it's to his credit and the credit of his wife and his children. He has succeeded in this essentially 11-year period since he was detained in early 2011 in maintaining a relationship with his wife and his children.

That's surprising and, as I say, speaks to all of their credit. So I understand those as appropriate 3553(a) factors. Of course I'll hear from the government. But put some flesh on what you think I should be doing here.

MS. BENETT: Your Honor, what's the Court's policy on wearing the mask?

THE COURT: Are you vaccinated?

MS. BENETT: I am vaccinated.

THE COURT: You may take it off while you speak.

MS. BENETT: Thank you, your Honor.

THE COURT: And if you wish, you can go to the lectern. It's up to you.

MS. BENETT: Oh, sure.

THE COURT: Let me say I have had other similar gang cases from Chinatown, not in the past few years. Things seem to be better. But Mr. Lin's history here as a "Dai Lo" is frightening, long-term extortion so significant that even when he flees -- and that's something the government will be telling me I'm sure. He fled to Canada after the murder.

Even after he flees, the person he extorted on that

other bus company is still paying him off. I would think the fear of retribution there was deep. And it certainly suggests that even while he was in Canada, he had people here who were under him in the gang who would exert retribution on somebody who didn't pay a tribute.

So that long-term extortion is very troubling. And obviously the strong inference is that it was accompanied by a threat of physical harm, let alone the murder. He walks into a gambling parlor with one of his subordinates and says, shoot him.

The person unloads his handgun and fires six shots after climbing up on a table. And Mr. Lin is there, not only not doing anything to stop it, he ordered it. And the defense that, well, I didn't know he was going to murder him. I just thought he was going to shoot him doesn't go very far. That goes to your murder 2 versus murder 1.

Those are all terrible, terrible crimes compounded by the tragic act that a totally uninvolved young waitress just working to make extra money is murdered, is killed, with a bullet through her head. And there's a second waitress who's injured. I think everybody can breathe a sigh of relief that she survived. I read the letter from her boyfriend. It's very moving.

So this man is responsible for the deaths of two people. That's very, very serious. I'd like to think

everybody is open to rehabilitation. And at some point, all we'd be doing is warehousing Mr. Lin.

At some point, as he gets older, the recidivism rates go down. At some point, the balance changes where it doesn't make sense to keep him incarcerated, one would think, or at least that's my theory. The government can try to talk me out of that.

But where that point is in light of these very significant crimes, I don't know. And of course, not surprisingly, there's the gambling parlor, operating the gambling parlor. So we've got murder; we've got extortion; we've got operating gambling parlors; we've got conspiracy to commit racketeering and racketeering.

The only thing that's different is the murder through a firearm during a crime of violence as a 924(j) count. Everything else is the same as it was before.

Speak to me.

MS. BENETT: Your Honor, it's not lost on myself or on Mr. Lin that we are asking this Court to give him an opportunity that is denied the two victims who died here, Maggie and Mr. Zhou.

There is no question that to the extent this Court is considering a sentence of anything other than life, that Xing Lin will have the benefit of the Court's mercy and some measure of justice that Mei Ying Li and Chan Qin Zhou did not. And I

recognize that that is a substantial and significant request that we are making.

I do want to turn briefly to the last phrase your Honor used, which was what is different. And I would note, in putting a number into our defense sentencing submission, I struggled. I struggled.

I was not sure what the right request would be or if it was even, under these circumstances, appropriate to make a specific request or if it were not better to just leave it as an open question for this Court.

But I ultimately landed on the proposed sentence of 180 months for these reasons: The facts here were the same as the facts the government knew on June 27 and June 28 of 2012 when --

THE COURT: Is that your ten-year argument?

MS. BENETT: Pardon?

THE COURT: Is that your ten-year argument?

MS. BENETT: Well, that was a point that I started from, and this is an unusual case because I know your Honor didn't preside over the trial. I was not the defense attorney at the trial. Mr. Fiddelman or Mr. Rohrbach were not the prosecutors at the trial. So we all come to this from sort of a historical perspective.

THE COURT: Mr. Fiddelman may not have been born then.

Go ahead.

MS. BENETT:  So I'm coming at this from something of a historical perspective.  And that was one thing that factored into my decision ultimately to make a specific request to this Court.

And the Court knows -- and the government addressed this -- I did also look at sentences, permissible sentences, for murder which I recognize that Mr. Lin was convicted of more misconduct than just that.  And I don't want to unduly belabor the murder 1 versus murder 2 point.

THE COURT:  I'm sorry, Ms. Benett.  Let me ask you something.

Do you know if his family members are able to understand this discussion?

MS. BENETT:  That is a great question.  Some are.  I know his children can and their friends.  His sister, to a certain extent.

THE COURT:  So you believe his children are fluent in English?

MS. BENETT:  Yes.

THE COURT:  What about his wife?

MS. BENETT:  She can understand some, but her children will probably be translating for her.  Both of their children were born in the United States and are native-born Americans.

THE COURT:  Does our translator have other earphones?

THE INTERPRETER:  Yes.

THE COURT:  If you could hand them out to family members first, I'd appreciate it, for those who feel they could use them.

MS. BENETT:  Thank you, your Honor.

THE COURT:  Thank you.  The children don't want them?

THE INTERPRETER:  No.

THE COURT:  All right.

MS. BENETT:  Thank you, your Honor.

So my point -- it's not really a ten-year argument because I'm not arguing that a ten-year sentence would be appropriate under these circumstances.  But it was one of the factors that I took into consideration when thinking about what might be a reasonable term here and thinking about what the government originally -- what the plea offer was prior to trial.

And I don't want to unduly belabor the murder 1 versus murder 2 point.  The Court obviously knows our argument on the basis of the papers, and we preserve our objection with respect to the finding of the level 43.

But the government clearly, clearly argued only for murder in the second degree.  The loss of the lives are no less grave and serious for being murder in the second degree, but the fact is that this was not a murder in the first degree case at any point.

In fact the government argued strenuously that it did

not have to prove the premeditation that would be necessary to establish murder in the first degree, and the jury was charged solely with respect to murder in the second degree.

But I don't know that that will be the driving factor of the Court's ultimate sentence here.  It was something that I took into consideration when looking at New York Penal Law which does authorize sentences of 15 years to life.

And obviously the government correctly recognizes that a longer, a substantially longer, sentence than 15 years is authorized under the New York Penal Law for murder in the second degree.  But it was something that I took into consideration when making that specific request.

There is not much that we have to say about the offense conduct.  The Court has described the evidence.  The jury returned the verdicts of guilty.  And we don't mean to revisit that.  We also don't mean to minimize the gravity of the conduct here.

As the Court knows from our sentencing submission, putting aside the legal arguments on the guidelines calculation, we spent most of our time thinking about the 3553(a) factors.  And I think that -- and I think that the Court has articulated this -- there is meaningful and important proof of Mr. Lin's rehabilitation.

As the government confirmed shortly after I began working with him, he met voluntarily with the government, had

several Rule 35 meetings.  Ultimately the government concluded that the information he provided was not useful, but they found him to be credible.

And in fact, the prosecutor at the time, who also was not the trial attorney, but did say we did agree to keep an open door, should they ultimately believe that they would be able to act on any of the information or need to reach out to Mr. Lin.

So that is from a very early stage I think an indication of his coming to terms with the consequences of his conduct, taking responsibility where he could.  The Court correctly noted, as the records reflect, that his institutional record has been extraordinary under the circumstances here.

And I know the government mad a reference to the fact that his appeal was pending for much of that time.  I don't think that that should diminish the serious efforts, demonstrated efforts, that he made while in custody to stay out of trouble in truly extraordinary circumstances, both during COVID but even before that while at the MCC.

And as the Court and the government are well aware, the conditions of confinement at the MCC were particularly harsh and problematic.  Once he was designated to the Bureau of Prisons, he was at a facility that was in periodic lockdowns.  His family, as the Court noted today, deserves much credit for maintaining the relationships that they have with

him.

I'll note that his family and children traveled a significant distance just to be here today. Everybody here worked, traveled in person, maintained contact by phone and by letters over the course of the past decade plus. I think that that is, in no small part, what gave Mr. Lin the strength and optimism to continue on the path that he has embarked on since being detained in this case.

And that optimism is especially remarkable in light of the fact that he was facing a life sentence. There was the most recent disciplinary infraction. I did subpoena the file from the MDC for that because the fact is that Mr. Lin speaks no English.

(Pause)

MS. BENETT: I did try to get the file from the MDC. I did subpoena that. I did not receive it, but I did so because I know, from my representation of Mr. Lin, that he does not speak English. And I believe, from the people I spoke with, that the report, as reflected in the summary records, was made by somebody who does not speak Foochow.

So I don't know if there was a mistranslation of some sort. I don't dispute the infraction itself, but the statement "I've got nothing to lose" does not reflect his conduct over the last 11 some years and certainly would not be consistent with the government's sort of soft theory that his conduct over

the last 11 years was only because his case was on appeal.

He knew that he was about to be resentenced.  He had every incentive over the last two years

THE COURT:  I've taken into account his essentially clean disciplinary record.  It may in fact be due to the fact that he doesn't speak English.  Maybe he's isolated and doesn't have much interaction with the other prisoners.  But from the standpoint of sentencing, I don't think it matters.  He has had essentially a clean disciplinary record.  I accept that.

MS. BENETT:  And he hasn't only been separated from others.  He's worked, as the Court knows from the work reviews we submitted.

THE COURT:  I meant socially.

MS. BENETT:  All right.  So on the rehabilitation, on the history and characteristics, I think the mitigation specialist here, his opinion about Mr. Lin's sort of hypervigilance and hyperarousal is important in putting some of the offense conduct in context.

I think it is also especially important when thinking about his behavior and conduct over the last 11 years that, taken outside of being required to -- being removed from the circumstances in which he had been living, abstaining from alcohol, he has demonstrated remarkable self-improvement, self-awareness, self-knowledge.

So I think that sort of addresses the rehabilitation

piece.  The history and characteristics I think we covered in the mitigation report and the defense sentencing submission.

I think ultimately the question for the Court comes down to punishment here.  I didn't speak much on deterrence.  I think this disciplinary record reflects that he has been specifically deterred from offending.  I think the statistics on recidivism with aging offenders supports the theory that he is unlikely to reoffend.

On the general deterrence front, I don't think that there's any question that a sentence of even 180 months, to the extent that general deterrence is accomplished through lengthy sentences -- and obviously there is a lot of social science disputing that.  But even if it is, a sentence of 180 months cannot be said to be getting off easy.

So the question I think ultimately is sort of reduced to what is the appropriate punishment here.  And I believe that this is -- this is the place where, as a defense lawyer, I have to sort of step away because it is ultimately the question of figuring out the balance between punishment and mercy that is uniquely within the Court's role.

I don't know what the right punishment is for these crimes.  There were two lives that were lost, and we are asking this Court to give Mr. Lin a chance to live his life when others were not given that opportunity.

At the same time, there must be mercy factored into

the sentencing here. And Mr. Lin, no matter what the sentence is, will be removed from this country immediately upon the termination of his sentence.

His daughter, who is in graduate school -- he will never have the opportunity to see her walk across the podium. The same is true for his son. His family has commendably established themselves as respectable, educated, contributing members of their community -- their school, their churches, their businesses.

And he will not be a part of that, and that is additional punishment that this Court should take into consideration when, again, measuring what is an adequate and sufficient but not greater than necessary sentence here.

THE COURT: Well, remember. He self-deported. He fled to Canada. So he wasn't going to have an in-person relationship with his family even before he was arrested.

MS. BENETT: So he did. Your Honor is correct that he left the country. I don't know that that means that he believed that he was not going to have a relationship, an in-person relationship, with them.

I think the circumstances here, the description itself, is useful. The sort of self-deporting also suggests that he might have had some idea of himself returning to his family that will not be possible in the future. He will be removed to China. And he will not, certainly not in any

reasonable manner, be able to return himself to the United States and to his family.

I know that he may want to address the Court, but I ask if you have any questions for me before I ask him.

THE COURT:  No.  I think I understand your position.

I want to hear from the government, and then I'll give him an opportunity to talk to me.  Thank you, Ms. Benett. Really these papers were excellent.

MS. BENETT:  Thank you, Judge.

MR. FIDDELMAN:  Thank you, your Honor.

Let me first say I hear the Court's initial decision or inclination to vary below the life guidelines.  So I will make my arguments within that framework.

Ultimately we do believe that a sentence of life imprisonment is appropriate.  But all of the same arguments justify an extremely lengthy term here.  The defendant here, frankly, was nothing short of a crime lord.  He was the leader of a gang that had as many as 20 members who were following him.

He was engaged in extensive amounts of violence and extortion throughout his network of gambling parlors, assaults. At least one other shooting was described in the relevant conduct.  And then of course the terrible incident in connection with the ongoing extortion that the Court has already summarized that tragically led to the loss of two

peoples' lives.

It's hard to overstate the seriousness of this conduct. Taking the life of another person, worse even, ordering a subordinate to do so in the course of another crime, is heinous conduct. And here, there were terrible collateral consequences to the innocent waitresses.

Fundamentally, your Honor, I disagree with the defense's description of the relevant factors here as boiling down to just a matter of punishment. I do not think it can be so simply concluded that protecting the public from future crimes of the defendant can be set aside that easily.

I do not think that deterrence, both individual and general, can be set aside so easily. And I do not think that a more broad concern for promoting respect for the law and reflecting the seriousness of the offenses can be set aside so easily.

There is no more serious offense than what has occurred here. And respectfully, I understand and appreciate where the defense is coming from in trying to find an anchor point. But respectfully, we submit that a request for a 15-year sentence is completely off base, given these facts and circumstances.

I will not linger on the legal arguments, as the Court has already resolved them. I will just briefly address, with respect to the question of the degree of murder, there's a

comparison of apples and oranges going on here.

New York state divides murder into degrees in a different way. In New York state, all intentional killings are called second-degree murder. And first-degree murder requires an aggravating circumstance like killing a police officer.

It's simply not -- second-degree murder under New York law is simply not second-degree murder under federal law. And there's nothing fundamentally improper about a finding, based on the trial evidence in connection with sentencing, that premeditation existed, which is precisely what the Court has found.

THE COURT: Which is precisely? What did you say?

MR. FIDDELMAN: Precisely what the Court has found.

So what has changed from the original sentencing? Well, first one of the several counts of conviction has been vacated. It is worth noting that it's a Section 924(j) count which related to the murder incident that was separately proven up as a component of the racketeering conspiracy.

So as a result, the overall factual mix is unaffected. And that vacatur was based on a legal technicality. So one of the three concurrent life sentences --

THE COURT: Well, you're calling a Supreme Court case a legal technicality.

Is that correct?

MR. FIDDELMAN: No, your Honor. I'm calling the

technical analysis that extortion is not a crime of violence a legal technical matter.  It certainly is the case that a 924(c) or 924(j) offense does not exist in connection with the defendant's conduct.  But the defendant's conduct is there and was captured by offenses of conviction proved at the trial.

So the government submits that the vacatur of that count should not, standing by itself, have any meaningful impact on the mix of information this Court considers in calculating an appropriate sentence.

And second, of course as the Court has pointed out, there is a post-sentencing record of behavior.  And the government acknowledges that that factor should be considered, as the Court has already articulated.

But the conduct here is incredibly dangerous.  It calls out for a significant sentence, driven primarily by the need to protect the public.

THE COURT:  That argument I agree in significant part with you.  But the answer to that, what you've just posited, is deportation, which surely he will undergo.

MR. FIDDELMAN:  Well, your Honor, respectfully, I submit that that's only a partial answer and only insofar as protecting the public can be said to be limited to the American public.

The defendant is a dangerous person who is at risk of engaging in additional criminal conduct upon release.

Deportation is an imperfect remedy. If deportation was sufficient to protect the public, it would be the sentence imposed on any noncitizen for committing a crime.

THE COURT:  No.  It would be the sentence imposed on any noncitizen insofar as the protection of the public is concerned but not in terms of what the sentence should be.

MR. FIDDELMAN:  Fair.  Yes, your Honor.  That's what I meant.

So the defendant is 42 years old now.

THE COURT:  No.  My records show he's about 50 now.

MR. FIDDELMAN:  I'm sorry.  I misspoke.

MS. BENETT:  That's correct, your Honor.  Yes.  I think the date of birth is not totally known, but he's about 50.

MR. FIDDELMAN:  I misspoke, your Honor.  I'm sorry. He was 42 years old at the time that the original PSR was prepared in 2014.

THE COURT:  Yes.

MR. FIDDELMAN:  I apologize. And he committed the instant crimes throughout his 30's.  So of course there's a consideration about aging out of crime, but this is not an individual who committed a rash act at age 18 or 19 and who then had an opportunity for have his brain to fully mature and move beyond those types of life choices.  By the time the defendant was arrested, he was in his late 30's and was making

fully informed and conscious life choices.

I also think, as I've already briefly discussed, sending a message to society more broadly, but also to the defendant, is a critical consideration here, whether termed as promoting respect for the law or general deterrence.  The sentence imposed on a case -- I was about to say a double-murder case, your Honor, but it's much more than that.

It's an organized crime case involving, among many other things, a double murder.  And that's significant, and the sentence imposed by this Court should reflect the degree of seriousness to promote the purposes of sentencing.

So for these reasons, your Honor, while the government ultimately believes that the mix of information here does warrant a guideline sentence of life, given the Court's inclination, we submit that a significant and lengthy term of imprisonment far in excess of the 15 years requested by the defense is absolutely necessary in this case.

THE COURT:  All right.  Thank you, Mr. Fiddelman.  I appreciate that.

MS. BENETT:  Can I just address a couple points?

THE COURT:  Yes.  Go ahead.

MS. BENETT:  On the murder 1 versus murder 2, just to be clear -- and I know Mr. Fiddelman was not the trial attorney.  Nor was I.  But even under the federal statute, the government clearly argued for second-degree

murder.

I'm quoting from the charge conference where AUSA Skinner is saying to Judge Cedarbaum: "We have to prove that murder occurred within the definition of Section 1111." That's not the New York Penal Law. That's the federal --

THE COURT: That's 18 --

MS. BENETT: That's 18 U.S. Code, Section 1111. That section includes both first-degree murder and second-degree murder under federal law.

"Your definition of murder," what the court had in the charge, "is limited just to first degree which requires both malice and premeditation. We need only prove second-degree murder under federal law which requires malice but no premeditation."

So I just want to be clear that it's not simply that second-degree murder under New York law is not second-degree murder under federal law but that in this trial, the government argued strenuously and successfully argued that the jury be charged only as to second-degree murder under federal law.

I want to be clear also that we're not asking this Court to easily set aside other sentencing concerns beyond punishment. Our point is that the question, as the Court knows, always is what is sufficient but not greater than necessary to accomplish each of the goals of the federal sentencing regime.

To the extent that Xing Lin may be or may have a history as a dangerous person, we know from 11 years in custody in extraordinary circumstances -- and this Court and the government and the defense know fully well from other cases how unusual it is for a person with this background to spend 11 years with essentially a flawless disciplinary record.

We know from that that additional time, which we're conceding is appropriate here, but we know from that that additional time would not be necessary to accomplish the goal of protecting the public; that additional time would not be necessary to specifically deter Mr. Lin; that additional time -- I haven't heard anything to argue other than just -- again, the punishment piece here, the nature of the most serious misconduct and the crimes here I think has to inform the Court and has to be the point that is difficult to figure out what is sufficient but not greater than necessary.

We aren't arguing that you need to put aside everything else. We're arguing that that is the -- the punishment piece is the hardest to balance here.

THE COURT: Well, I don't know what's the hardest piece. But not only punishment is at play, but general deterrence is. I think you're right about specific deterrence having lower relevance at this stage or certainly by the time he gets out.

Incapacitation is separate from punishment. Certainly

it is at play here.  But I don't think we have to put too fine a point on it.  The idea -- you're quite right -- where to land is what's in important.

MS. BENETT:  And being mindful of the goals of the federal sentencing regime, as well as the parsimony clause and what is sufficient but not greater than necessary here.

The last thing I just wanted to address with respect to Mr. Fiddelman's conduct about sort of aging out of criminal conduct, I will say -- and this is documented in the mitigation report -- the massive abuse of alcohol I think should not be ignored here as something that affected --

THE COURT:  The former massive abuse of alcohol.

MS. BENETT:  Right.  I'm saying this only because I think it does, in some ways, parallel what Mr. Fiddelman identified as the arguments about a person whose brain is not fully developed.  And the research, sort of the neuropsychology around the development of the prefrontal cortex and how that has helped us understand the actions and decisions that somebody might make at 16 or even 18, but would be different at 30.

THE COURT:  Right.  But he wasn't acting at 16 or 18 here, as Mr. Fiddelman points out.  He was well into his 30's.

MS. BENETT:  Right.  My point was that I think that it's important to understand the impact of his former alcohol

abuse on his brain function, frankly, not to excuse the conduct but to say that this is something that is in his past and we hope would assure the Court and give additional assurance that he is aged out of this conduct.

THE COURT:  Thank you.

Mr. Lin, you have the right to speak to me, sir.  You don't have to say anything at all.  I do have to say that anything you say can be used against you, but I am here to listen to you, sir, if you want to address me.

THE DEFENDANT:  I would like to apologize to this Court.  I would like to apologize to my family.  And I would like to apologize to the families of Chan Qin Zhou and Mei Ying Li.

I cannot undo the past.  If this Court gives me a chance to prove myself, I will not disappoint you.

THE COURT:  All right.  Thank you, sir.

THE DEFENDANT:  Thank you.

THE COURT:  Mr. Lin, let me ask you this:  To the extent you understand it, why do you think you engaged in these very, very serious crimes?

MS. BENETT:  Would you mind if the interpreter --

THE COURT:  Yes.  Of course you may speak with your lawyer.

(Defendant and counsel conferred)

MR. FIDDELMAN:  Your Honor, I'm going to step away so

I don't overhear the translation.

(Defendant and counsel conferred)

MS. BENETT:  Your Honor, Mr. Lin can say this, but I think he just doesn't quite know how to answer the Court's question, and I apologize.

THE COURT:  He doesn't understand the question, or he doesn't know the answer?

MS. BENETT:  The latter I think, your Honor.

THE COURT:  Is that what you gather from talking with him?

MS. BENETT:  Yes.  And I think that he's mindful of not wanting to --

THE COURT:  I take it you wish to maintain your right to appeal.

Is that what you're talking about?

MS. BENETT:  Yes.  I suppose that is a good point. But it's more I think that he is worried that he would answer in a way that might be displeasing or he just hadn't prepared himself to answer that question.  I'm happy to sit with him and talk through it if the Court wants.  But I think that he's just --

THE COURT:  All right.  Thank you.

MS. BENETT:  Thank you.

THE COURT:  Well, Mr. Lin, I'm not going to make you sit here while you think about it.  But I would think your

years in prison would have given you plenty time for you to have thought about it.

And I suggest that you, if you haven't thought about it up until now, you start thinking about it and you try to figure out why in the world you engaged in these extremely serious crimes.

We've been talking about the loss of two lives, but the ongoing obstruction and the number of racketeering acts are all very serious as well and had a significant impact on your victims.

On resentencing, my sentence is going to be 330 months. That's something over 27 years. It's hard to know exactly what the appropriate point is. I do think that Mr. Lin should have the opportunity to leave prison. He's going to.

He's just going to be in his late 60's or perhaps early 70's. He'll have a full opportunity to restart his life in China. But a very significant sentence is required here, but I do not think a life sentence should be imposed.

Before I formally impose sentence, are there any formal objections the defense wishes to assert at this time?

MS. BENETT: No, your Honor.

THE COURT: Government?

MR. FIDDELMAN: No, your Honor.

THE COURT: Please rise, Mr. Lin.

I hereby find on resentencing the offense level is 43,

the criminal history category is III, the guideline range is life in prison.  Pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that the defendant, Xing Lin, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 330 months.

That is going to be on Counts One and Two concurrent, and it is 240 months on Count Four concurrent.  Again, Counts One and Two, 330 months concurrent with each other.  And on Count Four, 240 months concurrent with Counts One and Two.  Count Three was vacated, and there was no conviction on Count Five.

Upon release from imprisonment, Mr. Lin shall be placed on supervised release for a term of five years on Counts One and Two concurrent and three years on Count Four concurrent with Counts One and Two.

It is the assumption of this Court that the defendant will be removed to China upon the completion of his custodial term and he does not have to serve his term of supervised release here in the United States.

I should state for the record that if the Court is incorrect on its guideline calculation and instead the proper guideline is offense level 37; criminal history category III; a guideline range of 262 to 327 months, as the defense asserts, the Court's sentence would be the same.

The supervised release shall be served with the

following mandatory conditions:

He shall not commit another federal, state, or local crime.

He shall not illegally possess a controlled substance.

He shall not possess a firearm or dangerous weapon or destructive device.

He shall refrain from any unlawful use of a controlled substance.

He shall submit to one drug test within 15 days of his placement on supervised release and at least two unscheduled drug tests thereafter as directed by his probation officer.

He shall cooperate in the collection of DNA as directed by his probation officer.

He also shall comply with standard conditions 1 through 12.

He shall also comply with the following special conditions:

He shall provide his probation officer with access to all requested financial information.

He shall not incur new credit charges or open additional lines of credit without the approval of his probation officer.

I am not going to impose that because I'm not going to impose a financial penalty here, apart from the special assessment.

MR. FIDDELMAN:  Your Honor, may I be heard on that point very briefly?

THE COURT:  Yes.

MR. FIDDELMAN:  The original sentence included a fine of $25,000.

THE COURT:  Yes.

MR. FIDDELMAN:  And I believe -- I don't have the exact records in front of me, but I believe that there has likely been payment towards that fine.

THE COURT:  That I wasn't aware of.  I knew there was a fine of $25,000.

Have there been payments made pursuant to that?

MS. BENETT:  I was just looking to see if I had any record of what the current balance is.

THE COURT:  Counsel should look at that.

MS. BENETT:  I don't think I have the information.

THE COURT:  In any event, there's no installment payment schedule for the fine that's imposed.

Is that correct, Mr. Fiddelman?

MR. FIDDELMAN:  I believe that there was. Judge Cedarbaum, when she imposed the $25,000 fine, imposed in the judgment a payment schedule based on the defendant's earnings while in Bureau of Prisons' custody.

THE COURT:  I have the judgment in front of me. Actually, that's what I was looking at.

MR. FIDDELMAN:  That is set forth on page 7 of the judgment, Section F.

THE COURT:  I see.  Let me take a look at it.  And if anyone has any records as to whether or not the fine has been partially paid, I want to know that.

MR. FIDDELMAN:  Your Honor, I don't have them in front of me.  But based on the information that is available, namely, that the defendant has been working while in custody and that the court's judgment was that portions of the defendant's earnings were to be paid towards the fine, I think it is safe to infer that there have been payments made.

And based on the calculation of the fine as having been based, in part, on money that was earned through the criminal conduct, the government would respectfully request that the $25,000 fine be maintained as part of this Court's resentencing.

THE COURT:  What's the position of the defense?

MS. BENETT:  So, your Honor, I know that the most recent job that Mr. Lin had was actually as a volunteer orderly.  So he was not receiving pay for that.

I would ask that the Court consider that he has --even if he were being paid while in custody, UNICOR's pay scale is such that he would not make --

THE COURT:  Yes.  I agree.  But the question is how do I effectuate that.  What I'd like to do, because I disagree

with the imposition of the $25,000 fine, is to provide --

whatever he has paid toward the fine, he has paid.  But I don't

want to impose it going forward.

How do I effectuate that?  In other words, there's no

need -- I don't see there to be a need for any remission to him

of any amount already paid.  But I don't think there should be

any imposition of a fine going forward.

MS. BENETT:  I understand.

THE COURT:  So the question is how do I effectuate

that in the judgment.

MS. BENETT:  I was actually going to say can you put

in the judgment that the fine has been satisfied with payments

already made and that as of this date, that there is no

additional fine imposed in this case?

THE COURT:  I don't know because on page 6, it has to

say -- there's a spot for what the fine is.

MR. FIDDELMAN:  Your Honor, I would respectfully

suggest that similar to the way a court can announce a

custodial sentence of time served, perhaps filling that portion

of the judgment in with a financial sentence of "amounts paid"

or something to that effect might work.

THE COURT:  My deputy tells me that the Southern

District ECF does not indicate that any payments have been

made.  Let's see.

For the record, my intentions should be clear that I'm

not going to impose a fine going forward.  But by the same token, to the extent he's paid a fine already, that should not be remitted to him.  So let me just see how we do that.

(Pause)

THE COURT:  All right.  What I just did, I was listing the special conditions, and I said that there's not going to be an installment payment schedule.  So I'm not imposing the special condition of not incurring new credit charges.

The special condition that I have imposed is he shall provide his probation officer with access to all requested financial information.

He shall obey all immigration laws and comply with the directives of the immigration authorities.

I am recommending to the Bureau of Prisons and the Department of Homeland Services that this defendant be removed from the United States at the end of his custodial term.

Another special condition is he shall submit his person, residence, place of business, vehicle, or any other premise under his control to a search on the basis that the probation officer has a reasonable belief that contraband or evidence of a violation of any condition of release may be found.

Within 72 hours of release from the custody of the Bureau of Prisons, Mr. Lin shall report in person to the probation office in the district to which he is released,

unless he is in the custody of the Department of Homeland Services.

Now, in regard to a fine, I am not imposing a fine except to the extent that Mr. Lin has already paid installments on the $25,000 fine imposed by Judge Cedarbaum. Otherwise, I am not imposing a fine.

But the intention of the Court is that, to the extent that a fine has already been collected by the United States government in connection with his earnings while incarcerated, that that fine should not be returned to the defendant.

And I'm doing that after considering the fact that the defendant lacks the ability to pay a fine going forward, after taking into account his lack of assets and his limited earning ability while incarcerated.

I'm not imposing restitution because there's no victim pursuant to 18 U.S. Code, Section 3663.

I am ordering the defendant to pay to the United States a special assessment of $400.

Now I take it that's already been paid. Probably more than that's been paid. Mr. Fiddelman.

MR. FIDDELMAN: Your Honor, I believe a $400 special assessment has been made because there were, at that time, four counts of conviction. There are now only three. So I respectfully submit that the special assessment should be $300.

THE COURT: You're quite right. You're quite right.

MR. FIDDELMAN:  And I believe that will result in a $100 remission back to the defendant.

THE COURT:  All right.  The order is that the special assessment be $300 because the counts of conviction are One, Two, and Four at this point.  If Mr. Lin has paid $400 because one of those counts of conviction has been vacated, the $100 should be returned to him immediately.

My reason for the sentence is I have sentenced Mr. Lin within the guideline range -- I'm sorry.  Below the guideline range.  It's a variance.  I've sentenced him below the guideline range as I have determined the guideline range.

The variance is because of his rehabilitation; the conditions of confinement while at the MCC and the MDC in the past few years during COVID; and the fact that he will be deported upon serving his custodial term and the fact that he has maintained contact with his wife and children and, in fact, according to the wife's letter, has a good relationship with the family.

Ms. Benett, do you know of any legal reason why this sentence should not be imposed as I have stated it?

MS. BENETT:  I do not, your Honor.

THE COURT:  Mr. Fiddelman?

MR. FIDDELMAN:  No, your Honor.

THE COURT:  I hereby order the sentence to be imposed as I have stated it.

Mr. Lin, you have the right to appeal the sentence I just imposed on you, sir.  And if you cannot pay the costs of an appeal, you have the right to apply for leave to appeal in forma pauperis.

If you make a request, the clerk of court will prepare and file a notice of appeal on your behalf immediately.  And indeed, if you do wish to file a notice of appeal, all you have to do is notify Ms. Benett of that.

And, Ms. Benett, if your client asks you to file a notice of appeal, I'm directing you to do so on his behalf.

MS. BENETT:  Yes, your Honor.

THE COURT:  Mr. Lin, do you understand your appeal rights?

THE DEFENDANT:  Yes.

THE COURT:  All right.  Thank you.

Is there anything else, defense?

MS. BENETT:  Your Honor, would you be willing to make a recommendation to the Bureau of Prisons that Mr. Lin's redesignation, that he be designated to a facility close to the Atlanta area to facilitate visits with his family?

THE COURT:  Yes.  I will recommend to the Bureau of Prisons that this defendant be housed in a facility in order to facilitate visits with his family that resides in Atlanta, Georgia.

MS. BENETT:  Thank you.

I don't believe that Mr. Lin participated in the Bureau of Prisons' RDAP program. And to the extent he has not, could the Court make a recommendation that he be permitted to do so.

THE COURT: I'll recommend to the Bureau of Prisons that he be permitted to enter the Residential Drug Abuse Treatment Program if he is otherwise eligible.

MS. BENETT: Thank you, your Honor.

THE COURT: Government, anything?

MR. FIDDELMAN: No, your Honor. Thank you.

THE COURT: All right. Thank you, all. I appreciate it.

(Adjourned)